*282 Littleton, Judge,
delivered the opinion of the court:
On May 80, 1942, plaintiffs as joint venturers, entered into a letter contract with the War Department for the construction of barracks, mess halls, storage buildings, officers’ quarters, a gasoline station, and other buildings for the 606 Tank Destroyer Battalion at Fort Leonard Wood, Missouri, at unit prices totaling $803,409.70. On the same day plaintiffs received a notice to proceed with the work within 10 days, and to complete the project within 90 days, although actually plaintiffs had begun work on the project on May 26,1942.
The formal contract which replaced the letter contract contained as Article 9 the Standard Form Delays-Damages Clause.[1] The specifications, which were made a part of the contract, contained, in part, the following provisions:
1-05. Commencement, Prosecution and Completion. (b) If the completion of the undertaking to be performed under the terms of this contract be delayed by reason of delay in the delivery of materials or supplies essential to such performance because of national defense priorities and without the fault or negligence of the contractor, the time of performance will be extended for a *283 period equal to such delay, as determined by the contracting officer, and subject to appeal, as provided in Article 9 of the contract.
(c) In case time for completion of the work is increased due to any of the causes specified herein, it is distinctly understood and agreed that the contractor will accept the additional time in which to complete his contract in full satisfaction of any delays encountered and the United States will not be liable for any costs or expenses incurred by the contractor as a result of the increased time for completion of the contract.
1-10. Organization, Plant and Progress.
(b) The contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts, overtime operations, and Sunday and Holiday work as may be necessary to insure the prosecution of the work in accordance with the approved progress schedule. If, in the opinion of the contracting officer, the contractor falls behind the progress schedule, the contractor shall take such steps as may be necessary to improve his progress and the contracting officer may require him to increase the number of shifts, days of work and/or the amount of construction plants, and/or overtime operations, all without additional cost to the Government.
$ $ # ‡ $
1-11. Claims, Protests and Appeals. If the contractor considers any work demanded of him to be outside the requirements of the contract or if he considers any action or ruling of the contracting officer or of the inspectors to be unfair, the contractor shall without undue delay, upon such demand, action, or ruling, submit his protest thereto in writing to the contracting officer, stating clearly and in detail the basis of his obj ections. The contracting officer shall thereupon promptly investigate the complaint and furnish the contractor his decision in writing, thereon. If the contractor is not satisfied with the decisions of the contracting officer, he may, within thirty days,_ appeal in writing to the Secretary of War, whose decision or that of his duly authorized representative shall be final and binding upon the parties to the contract. Except for such protests or obj ections as are made of record in the manner herein specified and within the time limit stated, the records, rulings, instructions or decisions of the contracting officer shall be final and conclusive. All appeals from decisions of the contracting officer authorized under the contract shall be addressed to the Secretary of War, Washington, D. C. The appeal *284 shall contain all the facts or circumstances upon which the contractor bases his claim for relief and should be presented to the contracting officer for transmittal within the time provided therefor in the contract.
2-01. Order of Work, (a) The work shall be carried on at such locations and in such order of precedence as may be found necessary by the contracting officer. The location and limits of the work to be done will be plainly indicated by the contracting officer or his agents.
Section 5-04 of the specifications related to lumber requirements and provided that the defendant would designate to the contractors the source of an allocate of the lumber required for the project, with the exception of mill work, wallboard, form lumber for concrete, and lumber for certain designated buildings. Plaintiffs were required to include $80,000 in the contract to cover the cost, including freight charges, of the lumber allocated by the United States. Within five days after the award of the contract plaintiffs were to submit to the contracting officer a requisition for the allocated lumber, setting forth a complete delivery schedule, making allowance for the fact that delivery of nonstructural grades would require at least 15 days prior to the date initial delivery was desired, and delivery of structural grades would require 30 days prior to the desired delivery date. Any unused lumber was to become the property of the Government -at the completion of the contract. ‘The specifications .also stated that a representative of plaintiffs would be required to attend a lumber auction in order to obtain their allocated requirements.
On June 1,1942, plaintiffs were notified to be present at a lumber auction in New Orleans on June 2, 1942, to receive their lumber allocation. Plaintiffs’ representative arrived in New Orleans on June 2, and immediately prepared a list setting forth plaintiffs’ lumber requirements and the desired delivery schedule, which list was delivered to a Government representative. After certain adjustments in plaintiffs’ proposed delivery schedule had been made, plaintiffs’ requirements were bid upon on June 5, 1942, and requisitions were signed by plaintiffs’ representative, by the agents of the lumber companies who were the successful bidders on that portion of plaintiffs’ requirements, and by the Government *285 representative. Plaintiffs’ representative then returned to the project, and within a period of approximately two weeks, issued to each supplier a purchase order. These orders called for deliveries in accordance with the agreed delivery schedule, to begin one on June 11, 1942, six on June 25, and to continue thereafter throughout July.
Plaintiffs initially planned to prefabricate as much of the lumber used in the project as possible, and to use specialized crews to perform the various phases of construction. To carry out this plan, plaintiffs set up a central sawmill in the heart of the construction area where all the lumber was to be delivered. Here the lumber, with the exception of the siding, was to be cut to size and made up into prefabricated units which were then to be delivered to the various buildings for installation by one of the specialized crews. A number of events, including delays in delivery of lumber, lack of skilled and efficient labor, and lack of efficient management on plaintiffs’ part prevented the contractors from ever putting the proposed plan entirely into operation.
Plaintiffs were instructed by the Area Engineer to proceed first with the construction of the barracks, as there was an immediate need for these buildings. However, work on the project progressed slowly during the month of June because of abnormally heavy rains. Between June 9 and June 26, 1942, plaintiffs experienced 7.83 inches of rain, the third heaviest rainfall for this area in the 54 years covered by the Weather Bureau reports, and were delayed, taking into account the days when progress was slowed by wet ground, a total of 14 days. During this period plaintiffs orally complained of these delays to the Area Engineer, as contracting officer, but did not file with him a written request for an extension of time, as required by the contract. In the discussion which followed, plaintiffs were informed by the Area Engineer that in his opinion the rainfall was average for June and that no extension would be granted unless plaintiffs could show that the weather had been abnormal. Other Government representatives connected with this project stated to plaintiffs that it was not customary to grant time extensions because of such delays, and that the project would have to be completed by the original contract date *286 regardless of what happened. This attitude on the part of the defendant’s representatives prevailed throughout the progress of the work.
During the entire performance period defendant’s representatives on the job found it necessary to instruct, and later to order, plaintiffs to bring the progress of the work up to schedule. On June 22, 1942, the Area Engineer wrote to plaintiffs complaining that the progress to date was unsatisfactory, and that it would be impossible to complete the project on schedule at the current rate. On June 24, the Resident Engineer addressed a similar letter to plaintiffs in which he “ordered” plaintiffs to double the size of their working force, and to work a second shift until the scheduled rate of progress had been attained, and on June 27, he instructed plaintiffs to work a minimum of one 10-hour shift on Saturdays and Sundays. By June 30, plaintiffs were 8 percent behind the scheduled rate of progress, and hence were ordered by the Area Engineer to increase immediately the size of their working force to 300 men per day.
Although 15 of the 49 buildings comprising the contract were under construction by July 3, 1942, and 26 were under construction by July 10, the project continued to be substantially behind schedule on these dates.
On July 15,1942, the Area Engineer again notified plaintiffs to put into immediate effect a 16-hour work day comprised of two shifts, and to employ many additional workmen, including 32 carpenters, on each shift. Plaintiffs were instructed at this time to expedite the work on designated buildings. In addition, plaintiffs were given detailed instructions for the improvement of the organization of the project, and specifically were ordered to employ a responsible materials checker capable of following up orders for materials.
Plaintiffs’ plan of operation set forth above was greatly hampered during the first part of July by substantial delays in delivery of the lumber allocated to plaintiffs from Government suppliers. The two-story barracks, which comprised a major portion of plaintiffs contract, were of frame construction built on concrete piers. The roofs of these barracks were supported by 6 x 6 posts extending from the first floor, and *287 placed about 10 feet apart forming bays. The roof of the machine shed was similarly supported by 6 x 6 posts. Although these structural posts and timbers were needed at an early stage in the construction of the barracks, their delivery was greatly delayed. The last shipment of structural lumber which had been scheduled for July 15 delivery, did not arrive until August 8,1942. Likewise, the lumber for use as girders and joists, which was scheduled to be delivered by June 25, 1942, did not begin to arrive until July 1,1942. What lumber was delivered came in an irregular manner which disrupted plaintiffs’ planned sequence of construction, and a number of carloads of allocated lumber did not reach the project until after the Government’s final acceptance of plaintiffs’ work. By July 21,1942, lumber deliveries were so far behind schedule that the District Engineer directed the contracting officer to authorize plaintiffs to buy the needed lumber wherever it could be found in order to avoid further delays. Plaintiffs at once telegraphed and telephoned lumber suppliers in Missouri, Arkansas, and Minnesota and were able to obtain prompt deliveries of the required lumber.
During this period plaintiffs orally complained to the Area Engineer that they were being delayed by nondelivery of lumber, but they did not make a written request for a time extension as required by the terms of the contract. Although the actual number of days that the project was delayed by nondelivery of lumber is not revealed by the evidence, it appears that plaintiffs were responsible for part of the delays, since on June 27, 1942, the Resident Engineer wrote to plaintiffs that orders for materials were being delayed by plaintiffs’ failure to furnish the suppliers sufficient information in placing the orders.
On August 5,1942, the plaintiffs were notified by the Area Engineer that the lack of progress on the project had become serious and that plaintiffs would have to effect an improvement in management if their contract right was to be continued. The Area Engineer stated that plaintiffs’ entire organization lacked interest in completing the contract on schedule and was inefficient due to improper supervision. It was recommended that plaintiffs correlate their activities under a competent superintendent, and take steps to elim- *288 mate the time being wasted by workmen. By August 10, plaintiffs had all 49 buildings under construction but had completed only approximately 65 percent of the contract as against a scheduled completion of 92 percent.
Although plaintiffs had estimated using a maximum of 250 carpenters at the peak of their operation, they were actually required to hire many more than this number by the Area Engineer who did not take into consideration delays attributable to adverse weather conditions and nondelivery of lumber. Bather the Area Engineer repeatedly instructed plaintiffs to hire more carpenters, and to work additional shifts, and to work Saturdays and Sundays in order that the project might be completed by the original contract date. As a result the number of carpenters employed by plaintiffs ranged from 81 on June 30, 1942, to 311 on July 21, to 411 on July 28, to a peak of 446 on July 29, and thereafter generally ranged downward. On August 21,1942, the Area Engineer wrote plaintiffs that he had received word that plaintiffs were contemplating laying off 100 men, and instructed them not to discharge any men without permission from his office. The Area Engineer likewise directed the local union to return to the project the men whom plaintiffs had discharged.
Plaintiffs, at times, needed the additional carpenters which the Area Engineer ordered employed. At other times the plaintiffs had no need for the additional carpenters because of the lack of lumber, or other conditions which prevented full construction activity. Consequently, plaintiffs did not, upon all of these occasions, comply with the Area Engineer’s instructions. On several occasions additional workmen were not available to meet the quotas set by the Area Engineer.
Plaintiffs protested orally to the Area Engineer that it was impossible to proceed with the project in an efficient manner with the large number of inefficient carpenters being sent to the project, and stated that what they needed instead were competent and efficient workmen. At times plaintiffs attempted to discharge inefficient workmen, but many of these men were returned, to the project at the Area Engineer’s direction. Plaintiffs suggested that if they were allowed to *289 increase the existing wage scale to meet the prevailing wage scale that obtained in adjoining towns, they could secure an adequate supply of competent carpenters, and could thus make better progress with fewer workmen. However, the Area Engineer refused to grant this request and continued to instruct plaintiffs to employ additional men at the contract rate of $1.00 per hour. Plaintiffs did not at any time during the progress of the work protest in writing, as required by paragraph 1-11 of the specifications, the orders of the Area Engineer requiring them to hire more carpenters.
Through the use of these additional carpenters, through the extensive use of overtime, and by, at times, working additional shifts, plaintiffs were able to finish the work within the original contract completion date, with the exception of the barracks which were completed 2 days late, and the gasoline station which was completed 7 days late.
Thereafter, on October 27,1942, plaintiffs wrote two letters of protest to the Area Engineer. The first letter attacked the deduction by the 'Government in the estimate for final payment of a $1,700 penalty as liquidated damages for delay in completing portions of the work. The plaintiffs stated in part that they were entitled to an extension of time because of unusually heavy rains and because allocated lumber failed to arrive on schedule. In the second letter plaintiffs complained to the Area Engineer, as contracting officer, about having to hire such large numbers of incompetent and unneeded carpenters, and set forth a claim for additional compensation and damages in the sum of $42,900. On November 4, 1942, the Area Engineer denied plaintiffs’ claims on the grounds that the delays due to rains had not been abnormal, that the failure of the lumber to arrive was the result of insufficient information furnished the suppliers by plaintiff, and the result of plaintiffs’ lack of a responsible materials checker, and that the hiring of additional carpenters was justified under paragraph 1-10 (b) and (c) of the specifications because of plaintiffs’ lack of progress- and supervision. This letter was supplemented by formal findings of fact on June 23,1943.
*290 Following the denial of their claims, plaintiffs, on November 7,1942, executed a release covering the contract work, but excepted therefrom their claim for remission of liquidated damages for failure to complete the project on time, and their claim for $42,900 additional compensation paid to carpenters. On November 28, 1942, plaintiffs appealed to the head of the department from the decision of the Area Engineer, and on March 15,1943, submitted a further application for $132,700 additional compensation resulting from the excess cost of the carpentry work.
The War Department Board of Contract Appeals, on November 8, 1943, reversed the decision of the Area Engineer and held that plaintiffs were entitled to time extensions because of weather delays and nondelivery of lumber allocated from Government suppliers. The Board refused to consider the claim for the excess costs of carpentry work on the ground that it was a claim for unliquidated damages arising from a claimed breach of contract, and thus was beyond their jurisdiction. The Board returned plaintiffs’ claim to the Area Engineer for a computation of the extension of time to which plaintiffs were entitled, and reserved to plaintiffs the right to appeal from this subsequent decision of the Area Engineer. On December 6, 1943, the Area Engineer issued a change order granting plaintiffs a 7-day extension of time as to part of the delayed work, and a 2-day extension as to the remaining portion of the delayed work, which was only sufficient to remit the liquidated damages previously assessed. Plaintiffs accepted this change order, and although they reserved the right to assert a claim for additional time extensions, they did not thereafter make the appeal provided for in the decision of the Board of Contract Appeals.
Plaintiffs now seek to recover as damages for breach of contract $98,006.59, which represents the excess of the actual cost of carpentry labor over the plaintiff’s estimated costs for such labor, plus an additional amount representing increased supervisory expenses, workmen’s compensation, social security taxes, and the overhead expense on the in *291 creased labor costs. Plaintiffs insist that they were in fact entitled to extensions of time for completion of the contract to a much greater extent than the few days ultimately granted, because of adverse weather conditions and nondelivery of Government allocated lumber. Plaintiffs urge that accordingly, the orders of the Area Engineer, as contracting officer, requiring plaintiffs to work multiple shifts, pay large amounts of overtime wages, and employ and retain in their service large numbers of incompetent carpenters who were not needed so as to meet the original contract completion date, constituted breaches of the plaintiffs’ contractual rights for which they are entitled to recover the increased costs that resulted. Plaintiffs contend that such action by the contracting officer disrupted the plaintiffs’ organization of their work, usurped the plaintiffs’ supervisory authority over their carpenter forces, and thus directly and unnecessarily increased their carpentry labor costs. Plaintiffs further maintain that the failure of the Government allocated lumber to arrive on schedule, or in logical sequence, upset the plan of operation for the project and likewise increased the costs of the carpentry work.
It is defendant’s position that the Area Engineer was justified under the terms of the contract specifications in requiring plaintiffs to hire more carpenters and work longer hours because throughout the life of the contract plaintiffs were behind their scheduled rate of progress due to non-excusable delays, and because plaintiffs had not made written requests for extensions of time for excusable delays during the period of performance. Defendant further insists that the failure of plaintiffs, during the progress of the work, to make protests in writing, as required by paragraph 1-11 of the contract specifications, that these orders of the contracting officer relative to carpenters were improper, and consequently, having failed to follow the prescribed administrative. procedure, plaintiffs cannot now maintain that such orders were breaches of the contract.
■ We are of the opinion that defendant’s contentions are correct. Paragraph 1-10 (b) of the contract specifications, *292 set forth in full above, provided that if in the opinion of the contracting officer the contractors fell behind the scheduled rate of progress, they could be required to work such hours, including night shifts, Sunday and holiday shifts, and overtime, as were necessary to insure the satisfactory progress of the work, and that these steps could be required without additional cost to the Government. On each of the various occasions when the Area Engineer ordered plaintiffs to increase their working hours and the size of their carpenter forces, the plaintiffs were well behind the scheduled rate of progress. Plaintiffs had not at the time of these orders complied with the terms of the contract as to the excusable delays which they had experienced, in that they did not make written requests for extensions of time. The Area Engineer’s refusal to make allowance during the construction period for the delays due to rain, and the failure of allocated lumber to arrive on schedule, was not the only cause of this lack of progress. On the contrary, the Area Engineer was continually forced throughout this period to instruct plaintiffs to coordinate their organization, to increase the efficiency of their men and eliminate wasted time, and to obtain a responsible materials checker and a competent superintendent. It is significant that even with the aid of additional carpenters plaintiffs did not at any time during the life of the contract attain the scheduled rate of progress. The evidence shows that plaintiffs could not have completed the work within the contract time as extended with a carpenter force of the size they had originally anticipated using. The.project was completed by the contract date, as subsequently extended, only through the use of the extra working hours and additional carpenters ordered placed on the project by the Area Engineer. Paragraph 1-10 (b) was inserted in the contract to permit the contracting officer to take steps to insure the completion of the contract work in just such circumstances as existed here. Therefore, we conclude that the Area Engineer did not breach the contract, but rather was acting within the scope of his authority under the contract when he ordered plaintiffs to employ additional carpenters and to work longer hours.
*293 A'.sufficient remédy was available to plaintiffs if they felt that they were aggrieved by these orders of the Area Engineer. Paragraph 1-11 of the contract specifications provided that if the contractors considered any action or ruling of the contracting officer to be unfair, they should without undue delay submit to the contracting officer a written protest thereto, and that if the contractors were dissatisfied with the decision of the contracting officer they should appeal within SO days to the Secretary of War. Plaintiffs did not at any time during the progress of the work make written protests to the Area Engineer concerning the hiring of additional carpenters. Rather, plaintiffs took no action until after the end of the construction period when, on October 27, 1942, they requested time extensions and protested that they had been required to incur increased labor costs through the excessive use of overtime and additional carpenters. Thus, plaintiffs’ position is similar to that of the plaintiff in Ross Engineering Company, Inc. v. United States, 118 C. Cls. 527, who had likewise encountered excessive rainfall, had verbally requested time extensions but had not made written requests for time extensions, and had been required to employ considerable amounts of overtime in order to complete the project. In denying plaintiff’s claim in the Boss case, we •stated at page 532 that—
Plaintiff’s claim for damages for delays is also without merit. It was delayed by excessive rain, on account of which it asked for an extension of time. The extension was granted, but not until after the work was over. When the request for the extension was first made, it was not refused or granted, but plaintiff was told it had to complete the job within the contract time or the work might be taken away from it. This was probably using the “big stick” more than was justified, but plaintiff had its remedy of appealing to the head of the department. It did not avail itself of this remedy, but instead worked its men overtime. And now plaintiff asks the defendant to pay it for having done so. The defendant neither expressly nor impliedly agreed to do so, and we know of no basis for requiring it to do so.
*294 Like the plaintiff in the Ross case, plaintiffs here were subjected to a liberal use of the “big stick” by the Area Engineer in his zeal to insure completion of the job by the original contract date. However, as pointed out above, plaintiffs did not avail themselves of their contractual remedies for protesting the use of the “big stick”, but instead added the additional workmen and employed large amounts of overtime labor as directed. Thus they cannot now recover from defendant for having done so. An additional basis for the Area Engineer’s action in this case exists in the provisions of paragraph 1-10 (b), which provision was not present in the Ross case. The Area Engineer’s orders were in no respect fraudulent and, hence, under the decision in United States v. Wunderlich, 342 U. S. 98, we may not set them aside.
Plaintiffs’ contention that the delays in delivery of the Government allocated lumber for the project increased the labor costs, must also fail. Under paragraphs 1-05 (b) and (c) of the contract specifications, plaintiffs agreed that if the work were delayed by nondelivery of allocated materials, they would accept extensions of time within which to complete the work in full satisfaction of the delays encountered, and that the United States would “not be liable for any costs or expenses incurred by the contractor as a result of the increased time for completion of the contract”. Thus the defendant is not liable to plaintiffs for any increased labor costs which may have arisen as a result of nondelivery of lumber. Plaintiffs accepted the extension of timé offered them by the Area Engineer for multiple causes of delay, reserving the right of appeal to the War Department Board of Contract Appeals. However, plaintiffs did not pursue this remedy, so that we are bound to accept the Area Engineer’s determination. We could not in any event determine for the record the length of the delays caused by the failure of the lumber to arrive on schedule.
Plaintiffs are not entitled to recover and the petition will be dismissed. It is so ordered.
Howell, Judge; MabdeN, Judge; Whitakee, Judge; and JoNes, Chief Judge, concur.

 * * * That the right oí the contractor to proceed shall not be terminated under this Article or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government including, but not restricted to any preference, priority or allocation order, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.”